<u>**NOT FOR PUBLICATION**</u>                                              **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN GUTHRIE, as beneficiary of an Accidental Death Insurance Policy issued in the name of Corey Guthrie, deceased, | Civil Action No. 12-7358 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant. | |

**LINARES,** District Judge**.**

　　Corey Guthrie died in a single vehicle motorcycle accident in Virginia on August 6, 2010 at age 27.  He was intoxicated at the time of his death.  At issue in this dispute is $270,000 in accidental death benefits provided by Defendant, the Prudential Insurance Company of America, to Mr. Guthrie through an employee benefit plan governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA").   Plaintiff, in his capacity as beneficiary of the Accidental Death Insurance Policy issued to Mr. Guthrie, brings a claim for wrongful denial of benefits under Section 502(a)(1)(B) of ERISA.  In particular, the issue is whether an exclusion contained in the relevant policy—generally precluding recovery where the death results from operating a vehicle while being legally intoxicated—applied to bar Plaintiff's claim for benefits.

　　The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The Court has carefully considered the submissions made in support of and

in opposition to both motions.   Based on the reasons that follow, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied as moot.

## **BACKGROUND**

The following relevant facts are not in dispute unless noted otherwise.

### A.  *The ERISA Plan*

Plaintiff John Guthrie ("Plaintiff") brings this lawsuit as the beneficiary of an accidental death and dismemberment insurance benefit provided pursuant to an employee benefit plan. (Def. 56.1 Stmt., ¶ 1; Pl. Resp. 56.1 Stmt., ¶ 1).   Plaintiff's son, Corey Guthrie (the "Participant"), was employed by CACI International, Inc. ("CACI"). (*Id*., ¶ 2).  As an employee, the Participant received coverage under his employer's Employee Term Life Coverage, Dependents Term Life Coverage, and Accidental Death and Dismemberment Coverage plan (the "Plan").  (*Id*., ¶ 3).  Pursuant to a group contract between CACI and Prudential, Prudential issued an insurance policy to CACI in connection with CACI's Plan to insure the benefits available to participants in the Plan, including the Participant. (*Id*., ¶ 4).  The Plan is comprised of Group Contract G-50511-VA between CACI and Prudential and its amendment; the certificate of insurance issued to CACI; and the summary plan description ("SPD").  (*Id*., ¶ 6).

The certificate provides further that "Prudential, at its own expense, has the right to examine the person whose loss is the basis of a claim. Prudential may do this when and as often as is reasonable while the claim is pending. Prudential also has the right to arrange for an autopsy in case of accidental death, if it is not forbidden by law." (*Id*., ¶ 11).  The Plan provides that: "[t]he Prudential Insurance Company of America as Claims Administrator has the sole discretion

2

to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious. (*Id.*, ¶ 12).   The Plan provides that "[i]f your claim for benefits is denied…you or your representative may appeal your denied claim in writing to Prudential;" that "[a] full review of the information in the claim file and any new information submitted to support the appeal will be conducted by Prudential;" that "Prudential shall make a determination on your claim appeal within 45 days of the receipt of your appeal request;" and that "[i]f the claim on appeal is denied in whole or in part, you will receive a written notification from Prudential of the denial." (*Id.*, ¶ 14).

Prudential's certificate of insurance states that the Plan's AD&D coverage "pays benefits for accidental Loss which results from a Covered Accident. Loss means your . . . loss of life." (*Id.*, ¶ 16).   The certificate of insurance provides that "Benefits for accidental Loss are payable only if all of these conditions are met: (1) You sustain an accidental bodily injury while a Covered Person; (2) The Loss results directly from that injury and from no other cause; (3) You suffer the Loss within 365 days after the Covered Accident . . . and (4) The Loss is due to a Covered Accident." (*Id.*, ¶ 17).   "Covered Accident" is defined as "an accident which happens to you while you are engaged in or the victim of a Hazard described in the Hazard provisions." (*Id.*, ¶ 18).   The certificate of insurance defines "Hazard" as follows: "the person is engaged in or the victim of a risk." (*Id.*, ¶ 19).   "Injury" is defined as "injury to the body of a Covered Person." (*Id.*, ¶ 20).   The certificate also contains the following exclusion: "[a] loss is not covered if it results… [w]hile operating a land, water or air vehicle, being legally intoxicated…." (*Id.*, ¶ 22). The amount of benefits at issue is $270,000.  (*Id.*, ¶ 22).

B. *Circumstances Surrounding Participant's Death*

On August 6, 2010, at approximately 12:59 a.m., the police were dispatched to an "accident involving a motorcycle." Pursuant to the Police Crash Report, the officer who arrived at the scene of the accident "discovered a motorcycle that appeared to have suffered extremely heavy damage." (*Id.*, ¶ 23). The officer also reported discovering the Participant, who was wearing a helmet and riding vest, lying on his side. The officer stated: "[t]he operator of the motorcycle appeared to be some distance from the wreckage of the bike. As I approached the person…I could observe a large wound in the area of his left buttocks, upper leg region. To me the leg appeared to be mostly severed. I immediately checked for vitals and could not detect any breathing or pulse on the victim….Rescue and fire responded to the scene and they began to perform CPR on the subject while trying to get him ready to transport." (*Id.*, ¶ 24). According to the police report, the Participant "ran off roadway to the right" towards an embankment on a dry road with no defects and in the presence of no adverse weather conditions. (*Id.*, ¶ 25). The emergency responders transported the Participant to the University of Virginia Hospital, where, at 1:37 a.m., he was pronounced dead by Dr. William Rushton, M.D. (*Id.*, ¶ 26). The death certificate, issued on August 11, 2010, completed by medical examiner Dr. Heather Sumner, listed the cause of the Participant's death as "blunt force trauma" due to "motorcycle accident," specifically "motorcycle collision with stationary object," with the time of injury listed as 12:59 a.m., and the time of death listed as 1:37 a.m. (*Id.*, ¶ 27). No dissection of the body was performed. (*Id.*, ¶ 29).

The coroner's report dated September 21, 2010, and completed by Dr. Deborah Kay, M.D., listed the cause of death as "blunt force trauma due to motorcycle accident" after "[the Participant] lost control of his motorcycle." Dr. Kay stated that the manner of death was an

4

accident. (*Id*., ¶ 30). The coroner's report indicated that the Participant was last seen alive by friends at the Lazy Parrot Grill, a bar in Albermarle County, Virginia about a mile from the scene of the crash. (*Id*., ¶ 31).

According to the September 29, 2010 report of Forensic Toxicologist David L. Burrows, Ph.D., with the Commonwealth of Virginia Department of Forensic Science, the Participant's blood alcohol level was 0.14% by weight by volume, and his vitreous humor alcohol level was 0.13% by weight by volume. No other intoxicants were found in the Participant's blood. (*Id*., ¶ 32). A blood alcohol level of 0.08% is the legal limit for operating a motor vehicle in Virginia. (*Id*., ¶ 33). The Certificate of Analysis indicates that the Participant's blood sample was received by the forensic toxicologist on August 25, 2010. (AR 171).

### C. *Plaintiff Files Claim for Benefits*

Plaintiff submitted his claim for benefits to Prudential on August 13, 2010. (*Id*., ¶ 34). Prudential acknowledged receipt of Plaintiff's claim in a letter dated August 27, 2010, but stated that it was unable to render a benefits determination until receiving all documentation relevant to the claim. Specifically, Prudential requested a copy of the autopsy report, a copy of the toxicology report, and a copy of the police/accident report. (*Id*., ¶ 36). On August 27, 2010 Prudential requested the police report regarding the Participant's motorcycle crash from the Charlottesville Police Department, and received the report on September 23, 2010. (*Id*., ¶ 37). From August 27, 2010 until January 5, 2011, Prudential sought to obtain relevant records from UVA hospital and the respective investigating agencies. (*Id*., ¶ 38). In a letter dated January 10, 2011, Prudential notified Plaintiff that it had denied Plaintiff's claim for benefits. (*Id*., ¶ 39). In this letter, Prudential informed Plaintiff that it had reviewed the claim forms submitted by the

employer; death certificate for the Participant issued by the Commonwealth of Virginia; Group Policy G-50511; the Commonwealth of Virginia Department of Motor Vehicles police crash report provided by the Charlottesville Police Department; the Coroner's Report; and the toxicology report issued by the Commonwealth of Virginia Department of Forensic Science. (*Id.*, ¶ 40).   Prudential stated, "[t]oxicology results provided by the Commonwealth of Virginia Department of Forensic Science confirm that the insured had a blood alcohol level of 0.14% at the time of the accident." (*Id.*, ¶ 42).   Prudential based its initial denial of Plaintiff's claim on its conclusion that the toxicology results of 0.14% reflected the deceased's blood alcohol level at the time of the accident, and that such blood alcohol level exceeded the legal limit for operating a motor vehicle in Virginia. (*Id.*, ¶ 43).   As such, Prudential denied Plaintiff's claim, applying the exclusion contained in the certificate that provides "that a loss is not covered if it results from injuries sustained while operating a land, water or air vehicle, being legally intoxicated or under the influence of any narcotic unless administered or consumed on the advice of a doctor."   In particular, Prudential stated, "Since the death resulted from a bodily injury with an elevated blood alcohol level nearly two times the state limit, we are unable to approve this claim for accidental death benefits." (*Id.*, ¶ 44).

Plaintiff disputes that the toxicology results relied upon by Prudential in denying the claim reflected the decedent's blood alcohol level at the time of the accident and/or that it could be reliably determined whether his blood alcohol level exceeded 0.08% at the time of the accident. (Pl. Resp. 56.1 Stmt., ¶ 44).

### D. Plaintiff's First Appeal

In a letter dated February 17, 2011, Plaintiff, through his current counsel, informed Prudential of his intent to appeal, and requested copies of documents on which Prudential relied in making its benefits determination. (*Id.*, ¶ 45).  In a letter dated February 25, 2011, Prudential provided Plaintiff, through his counsel, with the entire record of his claim and advised Plaintiff to "submit written comments, documents, or other information in support of the appeal" including Plaintiff's "reasons for disagreeing with our decisions" and "supplemental documentation . . . provid[ing] evidence that [the Participant's] death did not result from him being legally intoxicated while operating his motorcycle on August 6, 2010." (*Id.*, ¶ 46).   In a letter dated July 5, 2011, Plaintiff formally appealed through counsel.  Plaintiff acknowledged that "the claims examiner relied upon the toxicology results from the Commonwealth of Virginia Department of Forensic Science which revealed a blood alcohol content of 0.14% and a vitreous humor content of 0.13%." Plaintiff further acknowledged that "those levels do, indeed, exceed the 0.08% level for driving while intoxicated under Virginia law . . . ." However, Plaintiff asserted that "no one--other than the claims examiner--drew the conclusion that those were the blood alcohol levels at the time of the accident" and as such "it cannot be said to any reasonable degree of medical or toxicological certainly that Mr. Guthrie's blood alcohol level several minutes after he left the bar exceeded 0.08%. Prudential therefore cannot and has not met its burden of proving the applicability of the policy exclusion and coverage should be afforded accordingly." (*Id.*, ¶ 47).  Plaintiff included no medical or scientific evidence in his appeal to support his contention that the Participant's blood alcohol level was not above the legal limit at the time of the crash. (*Id.*, ¶ 48).  Prudential acknowledged receipt of Plaintiff's appeal in a letter dated July 12, 2011.  (*Id.*, ¶ 49).

In response to Plaintiff's appeal, Prudential wrote to the Commonwealth of Virginia Department of Forensic Science and in a letter dated July 12, 2011, to request the date and time the Participant's blood and vitreous humor samples were drawn; the date and time the tests were performed on the samples; whether the chain of custody was established and maintained on the samples; the Department's opinion as to whether the blood alcohol level of 0.14% would reflect the Participant's blood alcohol level between midnight and 1:00 a.m.; and the Department's opinion as to what the Participant's blood alcohol levels were during that time. (*Id*., ¶ 50). The Commonwealth of Virginia Department of Forensic Science responded in a letter dated July 18, 2011, informing Prudential that this information would only be available pursuant to a subpoena. The Department also informed Prudential it charges a fee for expert consultation or testimony in civil matters, and that its employees, including those who investigated the Participant's death, were not available to offer their opinions until a civil fee arrangement was signed and returned to the Department. (*Id*., ¶ 51).

Prudential wrote to the Medical Examiner's Office and in a letter dated July 29, 2011, requested the date and time blood and vitreous humor samples were drawn; the date the tests were performed; information on the chain of custody for those samples; and an opinion as to whether the postmortem blood alcohol concentration documented in the toxicology report would reflect the Participant's blood alcohol content at the time of the crash. Prudential received no response. (*Id*., ¶ 52).

On July 29, 2011, Prudential also requested that Albert A. Kowalski, M.D., VP & Medical Director at Prudential, complete a review of Plaintiff's claim file. (*Id*., ¶ 53). In particular, Prudential asked Dr. Kowalski if it could be determined, within a reasonable degree of medical certainty: (1) what the Participant's blood alcohol content was at the time of the

accident, (2) if so, what was the Participant's blood alcohol level at the time of the accident, and (3) whether, in his opinion, there was a causal connection between the Participant's level of intoxication and his death. (Id., ¶ 53). Dr. Kowalski completed his review of all information available to Prudential and issued a report dated August 3, 2011. (*Id.*, ¶ 54). In his report, Dr. Kowalski noted that Plaintiff was last seen alive at approximately midnight on August 6, 2010 at the Lazy Parrott Grill; that Plaintiff's accident was discovered at approximately 12:59 a.m. and that Plaintiff was pronounced dead at UVA Hospital at 1:37 a.m. (*Id.*, ¶ 55). Dr. Kowalski further noted that the postmortem toxicology report revealed a blood alcohol level of 0.14%, and a Vitreous Humor alcohol level of 0.13%. (*Id.*, ¶ 56). He went on to state that "a blood alcohol concentration is the measure of the difference between rates of absorption and elimination….In this case, no assumptions can be made concerning the [Participant's] absorption of alcohol as there are several unknown variables such as type of beverage, quantity of beverage, time of last drink, and quantity of food ingested." (*Id.*, ¶ 57). Dr. Kowalski continued that "the rate of elimination can be determined with a reasonable degree of medical certainty. The established range of values for the elimination rate of alcohol is .015-.020 g/dL/h. As per the information in the file, the accident occurred on August 6, 2010 between 0000 and 0059 hours. In my opinion, this is the most important time interval to consider when considering the Absorption, Distribution and Elimination of the Alcohol. The police found the [Participant] with multiple injuries and no pulse. Although CPR was started…the [Participant] would have had a very low blood pressure during CPR and perfusion of the intestines (for the absorption of alcohol and the liver & kidneys (for the elimination of alcohol) would have been very small during this time period. In addition, if the insured received IV fluids during CPR, it would have diluted the BAC and further decreased the BAC. Therefore, in my opinion, the maximum time that the insured

could have been absorbing significant amounts of alcohol from his intestines is approximately 1 hour but the insured would have been eliminating .015-.020 g/dL/h in the same time period." (*Id.*, ¶ 58). Dr. Kowalski concluded that "Vitreous humor alcohol [.13%] is useful to corroborate the blood alcohol level and can serve as an alternate specimen. Vitreous humor alcohol is important because postmortem purification does not contribute to the alcohol level in the vitreous. In this case, the vitreous humor alcohol level was .13%. You can estimate the blood alcohol level by multiplying the vitreous alcohol level by .85 to .95. In this case, the vitreous alcohol level of .13% times .85 and .95 reveals a range of .11-.12%, which supports that the [Participant] was legally intoxicated at the time of his death." (*Id.*, ¶ 59). In particular, Dr. Kowalski opined that:

> Once ingested, alcohol is absorbed into the blood system and the fluids surrounding various tissue and inside the cells. Blood has a lower water content than vitreous so the expectation is that the blood-vitreous alcohol ratio will be less than one. In cases where the ratio exceeds 1, the most likely explanation is that death occurred before diffusion equilibrium has been obtained….In my opinion, this suggests that the [Participant] was still absorbing alcohol from his stomach and the insured was in the absorption phase with rising blood alcohol concentrations prior to his death. Since the blood-vitreous alcohol ratio exceeds one, in my opinion, the [Participant's] vitreous humor alcohol concentration would be a more accurate reflection of the insured's blood alcohol concentration at the time of the accident.

(*Id.*, ¶ 60). Thus, Dr. Kowalski opined that: (1) it is possible to determine the Participant's blood alcohol level with a reasonable degree of medical certainty at the time of the accident, (2) the Participant's blood alcohol level was between 0.10 and 0.12% at the time of the accident, and (3) such blood alcohol level would cause the Participant to suffer "physical impairments as well as impairments in caution, reason & memory and the reduction in judgment and self-control"

leading to "a direct causal connection between the insured's level of intoxication and the motorcycle accident of 08/06/10 and his death." (*Id*., ¶¶ 61-65).

Between August 3, 2011 and October 26, 2011, Prudential continued to attempt to receive documents from UVA hospital and the agencies that investigated the Participant's motorcycle crash. (*Id*., ¶ 66). Prudential also conducted an investigation by its Special Investigations Unit. In the Special Investigations Unit report dated October 26, 2011, the investigator noted that there were no witnesses to the accident and that the medical examiner who performed the autopsy on the Participant would not speak to Prudential unless subpoenaed to do so during litigation. The Special Investigations Unit was able to obtain emergency department records from the University of Virginia Hospital. (*Id*., ¶ 67). Prudential provided these records to Dr. Kowalski who stated that their contents did not change his previous opinion regarding the Participant's intoxication level at the time of the accident. (*Id*., ¶ 68).

On October 31, 2011, Plaintiff's counsel inquired as to the status of Prudential's determination of Plaintiff's appeal, and in a letter dated November 3, 2011, Prudential explained that it had been attempting to receive medical records from the Forensic Science Lab, the Office of the Chief Medical Examiner, the Charlottesville Police Department, and UVA Hospital. Prudential further explained that it received all of the information it had requested on October 25, 2011, and that Plaintiff's appeal would be presented at the appeals review panel scheduled for November 9, 2011. (*Id*., ¶ 69).

On November 14, 2011, Prudential submitted Plaintiff's Appeal to an Appeal Team comprised of V. Angle, L. Quigley, and J. Primus. The Appeal Team unanimously recommended that Prudential's original decision to deny benefits should be upheld. (*Id*., ¶ 70). On November 16, 2011, Prudential denied Plaintiff's appeal; Prudential notified Plaintiff of its decision by

letter dated the same day. (*Id.*, ¶ 71).    In particular, the letter indicated that Plaintiff had reviewed the certificate of insurance, the Group Contract, the certificate of death, the police crash report; the medical examiner's report; the toxicology report; Plaintiff's February 17, 2011, and July 5, 2011, letters and the map of the crash site enclosed with the July 5, 2011 letter; the emergency department records from the University of Virginia Hospital; and Dr. Kowalski's review.  (*Id.*, ¶ 72).    Prudential stated that it was its understanding that the Participant was involved in a single motorcycle crash. Prudential stated that "[a]s per the Police Crash Report, [the Participant] failed to maintain proper control of his motorcycle and ran off the right to the right. He then hit a curb and guardrail….There were no adverse weather conditions, no roadway defects, and no vehicle defects." (*Id.*, ¶ 73).    Prudential further acknowledged Plaintiff's argument that only the claims examiner had concluded the Participant's blood alcohol level exceeded 0.08% at the time of the accident. In response, Prudential stated that that Plaintiff had not provided any alternative explanation for the accident, or any evidence as to the Participant's blood alcohol level at the time of the accident.  (*Id.*, ¶ 74).  Prudential then addressed the only evidence in the record that addresses the Participant's blood alcohol level at the time of the accident—Dr. Kowalski's report that stated that the Participant's blood alcohol level was between 0.10 and 0.12% at the time of the accident.  Based on this report, Prudential concluded that the Participant was legally intoxicated at the time of the accident, and thus, that the exclusion precluding recovery where the death resulted from being intoxicated applied to bar Plaintiff's claim.  (*Id.*, ¶ 75).

On November 29, 2012, Plaintiff filed the instant lawsuit seeking review of Defendant's denial of Plaintiff's claim for benefits under the Accidental Death Benefits policy issued to his son, John Guthrie.   This Court's jurisdiction is premised on 28 U.S.C. § 1331 inasmuch as

Plaintiff's claim for wrongful denial of benefits is brought pursuant to ERISA, 29 U.S.C. § 1001, et seq.   Each side has filed their own motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.   The Court will address each motion, in turn.

## LEGAL STANDARD

**A.    Summary Judgment**

Federal Rule of Civil Procedure 56(c) requires that a court grant a motion for summary judgment if the moving party has shown (1) the absence of a genuine dispute as to any material fact, and (2) that it is "entitled to judgment as a matter of law."   If the moving party successfully makes this showing, then the burden shifts onto the nonmoving party to present evidence sufficient to create a genuine dispute as to a material fact.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In determining whether a genuine dispute exists, a court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."   *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

**B.    Benefit Recovery Action under 29 U.S.C. § 1132(a)(1)(B)**

The civil enforcement provision of ERISA provides a cause of action for a healthcare plan "participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C. § 1132(a)(1)(B).   Courts review administrative denials of ERISA plan benefits under a *de novo* standard unless the benefits plan grants the administrator

"discretionary authority to determine eligibility for benefits."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  Where the terms of the benefit plan give the administrator "discretionary authority," courts use a deferential standard of review, referred to as an "arbitrary and capricious" standard or an "abuse of discretion" standard.  *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011); *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) ("In the ERISA context, an 'abuse-of-discretion' standard of review is used interchangeably with an 'arbitrary and capricious' standard of review.") (citing *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n. 6 (3d Cir.2010)).  "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies."  *Viera*, 642 F.3d at 413 (quoting *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999)).

Defendant has demonstrated that it was granted discretionary authority under the terms of the relevant employee benefits plan.  *See* AR 72.[1]  The Court therefore reviews the Defendant's decision under a deferential standard, and will only disturb the Defendant's administrative decision if it constituted an abuse of discretion.

## ANALYSIS

### A.   Defendant's Motion

Defendant moves for summary judgment on the following grounds: (1) Defendant thoroughly reviewed Plaintiff's claim, and (2) Defendant's decision to deny the claim based upon an exclusion—precluding payment of benefits when a participant's death results from their operation of a vehicle while being legally intoxicated—was reasonable and is entitled to

---

[1] "AR" refers to the Administrative Record.

deference.  In particular, Defendant argues that Prudential properly relied on Dr. Kowalski's report regarding the Participant's blood alcohol level at the time of the accident.

In opposition to Defendant's motion, Plaintiff argues first that Defendant's review of Plaintiff's claim was neither thorough nor correct because Defendant's investigation process failed to obtain important evidence bearing directly on its benefits determination, even though it knew the information existed and how to obtain it.  In particular, Plaintiff maintains that Defendant failed to establish a chain of custody for the toxicology test results and also declined the offer to obtain an independent, objective opinion from the toxicologist who interpreted the results of the test(s).  Second, Plaintiff argues that because critical data is missing, it cannot be reliably determined what the Participant's blood alcohol level was at the time of the accident; Defendant's determination was therefore unreasonable and therefore not entitled to deference.  In particular, Plaintiff maintains that the retrograde extrapolation performed by Dr. Kowalski—to compute the Participant's blood alcohol level *at the time of the accident* based on a test performed *after* the accident—is unreliable and would thus not be admissible to aid Defendant in meeting its burden of proof at trial.

As discussed above, the Court reviews Defendant's decision under the deferential "abuse of discretion," or "arbitrary and capricious" standard.  "A[n] [administrator] abuses his discretion by failing to use his judgment, when he acts 'without knowledge of or inquiry into the relevant circumstances and merely as a result of his arbitrary decision or whim.'"  *Metro. Life Ins. Co.*, 554 U.S. at 131 (quoting Restatement (Second) of Trusts § 187 cmt. h (1959)).  "Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator "only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Viera*, 642 F.3d at 413 (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845

15

(3d Cir.2011)).  The scope of this review is narrow, and "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (citation omitted). Moreover, any conflict of interest on the part of the administrator should be considered as a factor when determining whether the administrator abused its discretion. *See Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (discarding the "sliding scale" approach to conflicts, and holding that "courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions . . . [should] consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.").

As a preliminary matter, Plaintiff claims that there is an inherent conflict of interest because Prudential was both the claim payer and the claim evaluator.  Neither party disputes this, nor does either side dispute that this scenario creates an inherent conflict of interest for ERISA purposes.  *See Metro. Life,* 554 U.S. at 114-115.  However, not every conflict of this sort will be significant; rather, it is the particular facts that determine how much weight this factor should be given.  *See id.* at 117-118.  For example, the Supreme Court has explained:

> The conflict of interest at issue here [where a plan administrator both evaluates claims for benefits and pays benefits claims] . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

16

*Id.* at 117-118.   Plaintiff has submitted no evidence regarding the structure of Prudential's operations or otherwise suggesting a pattern of bias.[2]   Thus, while the Court takes note of Prudential's dual role, it finds no evidence in the record to accord this factor special emphasis.

In support of its claim that Defendant's denial of the accidental death benefits constituted an abuse of discretion, Plaintiff relies on three over-arching theories: (1) Defendant has not established a chain of custody of the Participant's blood from the time it was drawn from his body until the time it was tested, (2) Defendant could have but did not obtain an independent, objective opinion from the toxicologist who interpreted the results of the test(s), and (3) the retrograde extrapolation performed by Dr. Kowalski, Prudential's Vice President of Medical Affirs, to compute the Participant's blood alcohol level *at the time of the accident* is unreliable. The Court will address each claim in turn, but first reiterates that the <u>sole</u> issue before this Court is whether Defendant reasonably concluded, based on evidence contained in the record, that Plaintiff's claim for benefits under the Accidental Death Benefits Plan was not payable due to the exclusion precluding coverage where the death results from a participant's operating of a vehicle while legally intoxicated.

---

[2] *See generally Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117-118 (2008) ("The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.").

As to Plaintiff's failure to establish chain of custody argument, Plaintiff suggests that Prudential should not have relied on the toxicology report prepared by David L. Burrows, Ph.D., Forensic Toxicologist with the Commonwealth of Virginia, Department of Forensic Science, because:

> [T]here is nothing in that document which shows when the test samples were collected, by whom, or under what circumstances. Indeed, although Corey Guthrie was pronounced dead on August 6, 2010, the samples were not submitted to the laboratory until August 25, 2010, and not reported out until September 20.  The only thing linking it to Corey Guthrie is the appearance of his name on the report.

(Pl. Opp'n Br. at 15).  Plaintiff cites to no legal authority in support of its position that ERISA requires a plan administrator to independently establish a chain of custody as to the blood samples collected by the state in assessing whether or not to pay a claim for accidental death benefits.  In the absence of any legal authority requiring a plan administrator to independently establish a chain of custody under the circumstances presented here, it is the Court's view that Defendant—who played no role in the decision to administer the test or in the actual administration of the test—was entitled to rely on the official state department test, particularly in the absence of any evidence suggesting that such results are inaccurate or otherwise compromised.  *See, e.g., Papotto v. Hartford Life and Acc. Ins. Co.*, 2011 WL 6939331, at *2 (D.N.J. Dec. 30, 2011) ("It is generally reasonable for an administrator to rely on a toxicology report to establish intoxication.").  Because Plaintiff has come forward with no evidence suggesting, much less showing, that the toxicology report was inaccurate or compromised in any way, the Court finds that it was reasonable for Defendant to rely upon the toxicology report in making its benefits determination.  In other words, the Court finds that Defendant's reliance on the toxicology report—in assessing whether or not the exclusion at issue applied—was neither

arbitrary nor capricious. *See, e.g., Papotto,* 2011 WL 6939331, at *2 (finding administrator's reliance on toxicology report reasonable where "Plaintiff submitted no evidence to the administrator suggesting that it would be unreasonable to conclude that the report, though based on a sample collected several days after Mr. Papotto's death, could reliably establish intoxication at the time of the injury").

Next, Plaintiff argues that Defendant's denial of his claim for accidental death benefits was arbitrary and/or capricious because Defendant could have—but did not—obtain an independent, objective opinion from the toxicologist who interpreted the results of the test(s). Evidence in the record shows that in response to Plaintiff's appeal, Prudential wrote to the Commonwealth of Virginia Department of Forensic Science and in a letter dated July 12, 2011, to request the date and time the Participant's blood and vitreous humor samples were drawn; the date and time the tests were performed on the samples; whether the chain of custody was established and maintained on the samples; the department's opinion as to whether the blood alcohol level of 0.14% would reflect the Participant's blood alcohol level between midnight and 1:00 a.m.; and the Department's opinion as to what the Participant's blood alcohol levels were during that time. (AR 108; 218).  The Commonwealth of Virginia Department of Forensic Science responded in a letter dated July 18, 2011, informing Prudential that this information would only be available pursuant to a subpoena. (AR 182; 220).  The Department also informed Prudential it charges a fee for expert consultation or testimony in civil matters, and that its employees, including those who investigated the Participant's death, were not available to offer their opinions until a civil fee arrangement was signed and returned to the Department. (*Id.*). Plaintiff does not argue that Defendant's actions in this regard—including its ultimate decision *not* to subpoena the toxicologist or to pay him a fee for his expert opinion—are inconsistent with

19

Defendant's obligations as Plan administrator under the terms of the ERISA Plan,[3] the ERISA statute itself, or any binding legal authority construing same.  To the contrary, Plaintiff would essentially have this Court merely substitute its own judgment call for that of the plan administrator.  This is not permitted under the applicable standard of review.  *See Doroshow v. Hartford Life and Acc. Ins. Co.,* 574 F.3d 230, 234 (3d Cir. 2009) ("Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.  The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.' ").

Finally, Plaintiff challenges the reliability of Dr. Kowalski's retrograde analysis and ultimate opinion.  As stated above, Dr. Kowalski ultimately opined that: (1) it is possible to determine the Participant's blood alcohol level with a reasonable degree of medical certainty at the time of the accident through retrograde extrapolation, (2) the Participant's blood alcohol level was between 0.10 and 0.12% at the time of the accident, and (3) such blood alcohol level would cause the Participant to suffer "physical impairments as well as impairments in caution, reason & memory and the reduction in judgment and self-control" leading to "a direct causal connection between the insured's level of intoxication and the motorcycle accident of 08/06/10 and his death." (AR 194-96; 268-270).    In support of its position that Dr. Kowalski's retrograde extrapolation analysis is unreliable, Plaintiff relies on various cases arising in the criminal context, where the issue was whether the state had met its burden of proving *beyond a*

---

[3]  *See, e.g., Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir. 1993) ("Under the arbitrary and capricious standard, the court must defer to the administrator of an employee benefit plan unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).

*reasonable doubt* that the defendant was intoxicated, or whether the state had proven by clear and convincing evidence that the retrograde extrapolation was scientifically reliable.  Prudential, in its capacity as administrator of an ERISA plan, is not bound by the standards of proof applicable in criminal cases in assessing claims for benefits under an ERISA plan.  Rather, in considering Plaintiff's claim for accidental death benefits, Prudential was obligated to render a reasonable decision that is supported by substantial evidence contained in the administrative record.  *See generally Doroshow*, 574 F.3d at 234 ("Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.").  Thus, the sole issue before *this* Court is whether Prudential's denial of Plaintiff's claim—including its determination that the Participant's death resulted from his operating of a vehicle while being legally intoxicated—is supported by substantial evidence in the record.  The criminal cases relied upon by Plaintiff recognize not only the use of but also the reliability of retrograde extrapolation to compute an individual's blood alcohol level for point in time in the past.  *See, e.g., Mata v. State*, 46 S.W. 3d 902, 916 (Tex. Crim. App. 2001) ("We believe that the science of retrograde extrapolation can be reliable in a given case."); *State v. Hughey*, 138 N.M. 308, 310 (N.M. App. 2005) ("Thus, we have suggested that retrograde extrapolation might suffice to provide a nexus between the results of a defendant's BAC test and the likely BAC at the time of driving."). There is no indication in the record that Plaintiff ever attempted to submit evidence to Prudential showing that Dr. Kowalski's retrograde extrapolation analysis was unreliable or otherwise inadequate.  Nor does the record show that Plaintiff presented any evidence to Prudential suggesting that the Participant was *not* legally intoxicated at the time of his death.  *See generally Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of

course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). In the absence of such evidence, the Court concludes that Dr. Kowalski's retrograde analysis and ultimate opinion was based on substantial evidence and was reasonably relied upon by Prudential in assessing Plaintiff's claim for accidental death benefits under the Plan. *See, e.g., Abnathya*, 2 F.3d at 47-48 ("Other than the conclusory note from Abnathya's treating physician, stating only that, in his opinion, Abnathya was still totally disabled and unable to perform any gainful activities, Abnathya submitted no medical evidence to the Committee to substantiate her claim of continuing total disability, as is required of her under the Plan.").

Based on the evidence contained in the administrative record, this Court finds that there was a reasonable basis for and substantial evidence supporting Prudential's decision to deny Plaintiff's claim for accidental death benefits. In particular, the evidence substantially supported Prudential's finding that the Participant was legally intoxicated at the time of the accident and death. The Police Report indicated that on August 6, 2010, at approximately 12:59 a.m. the Police were dispatched to an "accident involving a motorcycle." (AR 161). The Report further indicates that the Participant "Ran Off Road – Right" towards an embankment (or guardrail) on a dry road and in the presence of no adverse weather conditions. (AR 160; 191). The Coroner's Report stated that the Participant was last seen alive by friends at the Lazy Parrot Grill, a bar in Albermarle County, Virginia, about a mile from the scene of the crash and about an hour prior to the crash. (AR 168). The Coroner's Report also stated that the Participant died after he "lost control of his motorcycle." (AR 169). The Death Certificate indicates that the Participant was pronounced dead at 1:37 a.m. the cause of the Participant's death was "blunt force trauma" due to a "motorcycle accident;" in particular, it provides that that his death resulted from a

22

"motorcycle collision with stationary object." (AR 185).   According to the postmortem toxicology report prepared by David L. Burrows, PhD, of the Department of Forensic Science, Commonwealth of Virginia, dated September 29, 2010, the Participant's blood alcohol level was 0.14% by weight by volume and his vitreous humor alcohol level was 0.13% by weight by volume. (AR 171).  The toxicology report indicates that samples of the Participant's blood were received by the Department of Forensic Science, Commonwealth of Virginia, on August 25, 2010 and that such evidence was submitted by an individual named "Nicole Athey."  (AR 171). The parties do not dispute that a blood alcohol level of 0.08% is the legal limit for operating a motor vehicle in Virginia.  (Def. 56.1 Stmt., ¶ 33; Pl. Resp. 56.1 Stmt., ¶ 33).   Also in the administrative record is the August 3, 2011 report issued by Prudential's reviewing physician, Dr. Kowalski, wherein he opined that: (1) it is possible to determine the Participant's blood alcohol level with a reasonable degree of medical certainty at the time of the accident through retrograde extrapolation, and (2) the Participant's blood alcohol level was between 0.10 and 0.12% at the time of the accident.  (AR 194-96; 268-270).

The evidence also substantially supported Defendant's finding that the Participant's intoxication caused or at least contributed to the accident and resulting death.  In particular, in his August 3, 2011 report, Dr. Kowalski opined that the Participant's blood alcohol level of between 0.10 and 0.12% at the time of the accident would cause the Participant to suffer "physical impairments as well as impairments in caution, reason & memory and the reduction in judgment and self-control" leading to "a direct causal connection between the insured's level of intoxication and the motorcycle accident of 08/06/10 and his death." (AR 194-96; 268-270).

As stated earlier, the alcohol exclusion contained in the Accidental Death Benefit Plan at issue provides that "[a] loss is not covered if it results… [w]hile operating a land, water or air

vehicle, being legally intoxicated…." (AR 37-39).   In light of the foregoing evidence, Defendant has demonstrated that its denial of coverage was based on the clear language of the Plan, substantial evidence contained in the administrative record, and was therefore neither arbitrary nor capricious.   Defendant's motion for summary judgment is granted.

**B.     Plaintiff's Motion**

Having determined that there are no genuine issues of material fact in dispute as to whether Defendant abused its discretion when it denied Plaintiff's claim for accidental death benefits, and having further determined that Defendant's motion for summary judgment must be granted, Plaintiff's motion for summary judgment is hereby denied as moot.

## CONCLUSION

Based on the reasons set forth above, the Court concludes that Defendant has demonstrated that its denial of coverage was based on the clear language of the Plan and on substantial evidence contained in the administrative record, and was therefore neither arbitrary nor capricious.   Defendant's motion for summary judgment is **granted**.  Plaintiff's motion for summary judgment is **denied as moot**.  This case is hereby **closed**.

An appropriate Order accompanies this Opinion.


                                              s/ Jose L. Linares
                                              Jose L. Linares
Date:  July 8, 2014                           United States District Judge